UNITED STATES of America, Appellant,

v.

Mrs. Edna BRITT, Appellee.

No. 20968.

United States Court of Appeals Fifth Circuit.

Aug. 12, 1964.

---

Robert E. Hauberg, U. S. Atty., Jackson, Miss., Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Robert N. Anderson, Stephen Wolfberg, Frank I. Goodman, Attys., Dept. of Justice, Washington, D. C., for appellant.

James Leon Young, Young & Young, Jackson, Miss., for appellee.

Before TUTTLE, Chief Judge, and POPE * and BROWN, Circuit Judges.

POPE, Circuit Judge.

This case involves a dispute over the taxability as income of certain funds involved in small loan transactions in Mississippi. A deficiency letter had been issued to taxpayer, the deceased husband of plaintiff Edna Britt, and he had paid the deficiency. His widow sues to recover that amount.

The small loan business in Mississippi is regulated by the Small Loan Regulatory Act, Miss.Laws (1958), c. 170; 4A Miss.Laws Anno. Sec. 5591–01 et seq. (1962 Supp.). Three parties are involved in small loan transactions: the borrower; the broker, who arranged and guarantees the loan; and the lender, who puts up the money. Taxpayer was a broker.

To understand clearly the dispute in this case the facts of the transactions in which the broker taxpayer was engaged must be set forth in some detail. A prospective borrower would go to the broker's office; the borrower would fill out a loan application and at the same time he would sign a note agreeing to pay back the loan plus interest and plus the broker's fee if the loan is approved; the broker would then forward the application to the lender together with a statement of the amount of the loan applied for. Under his contract with the lender, the broker agreed to guarantee all loans made by the lender to the broker's clients, and to ensure that he could fulfill this guaranty, the broker was required to keep on deposit with the lender an amount equal to 25 per cent of the loans outstanding to the broker's clients. The broker could amass this fund in two ways: he could deposit the amount with the lender, or he could "deposit with the lender three per cent (3%) of the amount of each draft drawn by the Broker on the Lender on behalf of the Broker's customers, which said three per cent (3%) shall be deposited in the guaranty fund * * *, and shall be so paid by the Broker as each draft is drawn on the Lender." If the lender approved the loan, the broker was authorized to draw a draft on the lender for the amount of the loan less discount for interest and the three percent for reserve, mentioned above. The broker then gave the bor-

---

* Of the Ninth Circuit, sitting by designation.

rower the amount of the draft less his service fees.[1]

The income claimed taxable here is made up of the aggregate of such reserve funds in the hands of the lender, (such as the $10.49 mentioned in the last footnote). Whether these sums were taxable to the broker in the year in which they were thus deposited with the lender depends upon a determination as to the source of such funds—who paid them, and to whom or for whom they were paid.

The Government asserts that the real transaction here was one whereby the borrower, the broker's customer, paid the broker a service fee, authorizing such fee to be withheld from the proceeds of the borrower's note. Then, said the Government, a portion of that fee was deposited with the lender as a guaranty reserve, it being arranged by broker and lender, for their convenience, that this reserve reach the lender by permitting him to withhold it from the proceeds of the note, and hence it was deducted from the amount of the draft. Thus it is contended that the broker has assigned this portion of his fee from the borrower to the lender, to meet his obli-

gation to keep up the guarantee fund. In substance it is said the borrower has paid this fee to the broker, who has simultaneously deposited it with the lender to meet his obligation respecting guarantee deposits.

Appellee Britt's answer to this is a simple one. She says: "The reserve retained by the lender herein in 1958 was not taxable to the taxpayer-broker in 1958, as it was not received actually or constructively in that year." This would have much force if the broker were employed or was to be paid by the lender.[2]

The trial judge's opinion accepted taxpayer's version of the transactions here involved. He inferred from the facts, all of which were stipulated, that "the fund in question never was actually or constructively received by the taxpayer during the taxable year in suit, and that the taxpayer being on a cash basis never became liable to the United States for any taxes thereon." [3]

We conclude, on the basis of the contract between the parties here, and in the light of the Mississippi small loans statute which governed these transactions, that this trial court's finding is

---

1. To illustrate: Assume the borrower wishes to secure through such procedures $300 to be repaid in one year. The applicable law permits the lender to charge six per cent per annum; service charges and interest combined cannot exceed "two per cent of the amount of cash received by the borrower multiplied by the number of months for which the loan is extended". The interest and the broker's service charge combined in this case may equal $72, 2% of $300 times 12. This would make a total of $372. Interest on this sum at six per cent would be $22.32. Deducting this from $72 (the total allowable interest and service charge) would leave the allowable charge $49.68. The three per cent reserve would be $10.49. The amount of the loan would include both interest and service fee $72. Lender would retain his interest ($22.32) and the reserve ($10.49) and the broker would thus draw a draft for the $300 for his customer plus the balance of his service fee ($49.68 less $10.49) or $339.19, handing $300 of this to the borrower.

2. An illustration of such a situation may be found in Commissioner of Internal Revenue v. Hansen, 360 U.S. 446, 79 S.Ct. 1270, 3 L.Ed.2d 1360, where the automobile dealer, who had taken contracts from purchasers of automobiles, made a deal with the finance company in which it was recited that the dealer "does hereby sell, assign and transfer to [finance company] his * * * right, title and interest in and to the within contract." The finance company then remitted to the dealer taxpayer the major percentage of the price for this sale of the contract, retaining the remaining percentage as a "Dealers Reserve Account". There the purchase price of the paper was owed by the finance company to the taxpayer and the sum withheld was taxable to him only because he was on the accrual basis.

3. The formal finding was: "The taxpayer did not receive, either actually or constructively, any part of the reserve fund in question during the taxable year in question."

both clearly erroneous and in conflict with the controlling state statute.

The contract between the lender and the broker discloses that the fund in the reserve held by the lender was neither compensation payable by lender to broker nor a sum payable from lender for notes purchased or otherwise. The whole of the service fee (the $49.68 mentioned in footnote 1, supra) was payable by the borrower to the broker for services rendered borrower by the broker. This is in no respect altered by the fact that this sum came from the proceeds of the loan note. The contract expressly recites that the broker is engaged "in the business of soliciting loans of money for its clients of [sic] customers," that a transaction such as here involved would be initiated "when the Broker has a customer desiring a loan," and there follows "an application form filed by the customer or client of the Broker." It recites that in collection of payments on the loan the broker "should be acting solely and only as the agent of the borrowers." The borrowers are repeatedly referred to as "the Broker's customers." The contract expressly refers to two charges: "The Lender shall charge interest on such loans made to the customers of the Broker at the maximum rate permitted by Section 9 of [the Mississippi statute]", and it was agreed that "the combined interest charged by Lender and brokerage fee charged by Broker shall not exceed the maximum under said Section 9." Thus unquestionably the broker was acting solely on behalf of his customer or client, and as his agent, and the broker's service fee was owed and payable to him by the borrower. In no sense was this service fee, or any of it, money payable by the lender.[4]

That this contract followed and conformed precisely to the requirements of the Mississippi statutes is plain from an examination of its provisions and of the Mississippi decisions. The statutes here referred to, the Small Loan Regulatory Act, and the Small Loan Privilege Act, were adopted in 1958. They appear as 4A Miss.Stats.Anno. (1962 Supp.) Secs. 5591–01 to 5591–44, Title 21, Chap. 8. (These sections are commonly referred to as Sections 1 to 44 inclusive.) The contract, previously mentioned, expressly recites that the parties contemplate doing business pursuant to these statutes. Under them a lender and a broker must each procure licenses and furnish bonds. "No licensee shall do a business of both handling loans and lending money." (Sec. 13.) The licensee for "handling loans" is one who does so "for a borrower for a fee, commission or charge *paid by the borrower*, and who arranges, negotiates, obtains or procures a loan of money for the borrower." (Sec. 2) (Emphasis added.) This amount charged the borrower, exclusive of interest, is called a "service charge" for services "rendered or to be rendered the borrower * * * in arranging or negotiating a loan, and for * * * guaranteeing, endorsing * * * and other actual services rendered the borrower by the licensee." (Sec. 2 (3)) "A different type license shall be issued for persons engaged in the business of lending money, either directly or indirectly, from licenses issued to persons handling loans for a fee, commission or service charge *to be paid by the borrower*" (Sec. 44.) (Emphasis added.)

We note that these Sections 2 and 44 particularly recite that under the system of small loans here employed and authorized by the statute, the broker's fee, commission or service charge is to be "paid by the borrower". This is consistent with the fact that the borrower is the

---

4. The exhibit H made part of the stipulated record shows how the parties computed the three per cent reserve. This was calculated on what they called the "Net Amount", which included the amount of the loan advanced to the borrower, plus the full amount of the broker's commission. Thus the parties disclosed their view that the entire commission first passed to the broker who then returned the three per cent mentioned to the lender.

customer of the broker and the broker is the borrower's agent.

That it is the borrower who agrees to pay such a fee to the broker was noted in Early v. Williams, 239 Miss. 320, 123 So.2d 446 (1960) where a borrower had defaulted on his loan and was sued. Defendant asserted the note was unenforcible because it included an amount representing the brokerage fee, which was claimed to be excessive. Said the court (pp. 328–329, 123 So.2d p. 449): "It seems incredible that any borrower, to get the sum of money which appellants received, would be willing to incur the stated expenses incident thereto. This is especially true as to the enormous brokerage fee. The right of a broker to charge a fee for his service in procuring a loan has long been recognized in the jurisprudence of this state. See Tower Underwriters, Inc. v. Lott, 210 Miss. 389, 49 So.2d 704. * * * Chapter 170, Laws of 1958, supra, expressly authorizes contracts such as are found in this case; and a party cannot be penalized as long as he complies with the law." In accord is Powell v. Sowell, 245 Miss. 53, 145 So.2d 168, 146 So.2d 576 (1962).

Again, in Hooper v. Aetna Finance Co., 244 Miss. 799, 145 So.2d 907 (1962) the borrower claimed the money paid to Aetna, the broker, was interest and hence the loan contract was void because of usurious interest. This claim was rejected on the ground that the payments, aside from the principal sum and six per cent interest thereon, were service fees owed to the broker.

What all this amounts to is that these borrowers paid from the proceeds of the loan notes not only interest to the lender but also brokerage fees or service charges to the broker, Britt. That a portion of the service charge or fee was placed in the hands of the lender as security for the broker's guarantees in no manner altered the essential nature of what went on. And no material significance can turn upon the fact that Britt, instead of putting up the guaranty fund by exercising his option, stated in the contract, to deposit the same "in cash", chose to provide the deposit by depositing with the lender three per cent of the amount of each draft.

In substance then, the portion of broker's fees represented by the three per cent was paid by the borrower, and it went into the hands of the lender pursuant to the broker's agreement that it be received and held by the lender as a guaranty fund "as a means of assuring the Lender" of broker's ability to perform his guaranty of the notes. More simply stated, borrower, owing this money to broker, at the latter's direction passed the money to the lender.

In Blalock v. Georgia Ry. & Electric Co., 5 Cir., 246 F. 387, 390, this court said: "A creditor as truly receives payment of what is due him when, pursuant to his direction, the debtor makes payment to another, as he does when payment is made directly to himself." This case was cited with approval in Old Colony Tr. Co. v. Commissioner, 279 U.S. 716, 730, 49 S.Ct. 499, 73 L.Ed. 918. In Raybestos-Manhattan, Inc. v. United States, 296 U.S. 60, 64, 56 S.Ct. 63, 65, 80 L.Ed. 44, the Supreme Court pointed out "Income is not any the less taxable income of the taxpayer because by his command it is paid directly to another in performance of the taxpayer's obligation to that other." In Helvering v. Horst, 311 U.S. 112, 116, 61 S.Ct. 144, 147, 85 L.Ed. 75, the Supreme Court also observed: "But the rule that income is not taxable until realized has never been taken to mean that the taxpayer, even on the cash receipts basis, who has fully enjoyed the benefit of the economic gain represented by his right to receive income, can escape taxation because he has not himself received payment of it from his obligor. The rule, founded on administrative convenience, is only one of postponement of the tax to the final event of enjoyment of the income, usually the receipt of it by the taxpayer, and not one of exemption from taxation where the enjoyment is consummated by some event other than the taxpayer's personal

**912**

receipt of money or property. * * * If the taxpayer procures payment directly to his creditors of the items of interest or earnings due him, * * * he does not escape taxation because he did not actually receive the money."

This rule, applied to the facts in this case, compels a holding that the portions of the brokerage fees here in question which were posted with the lender were income actually received by the taxpayer, and hence taxable to him in the year here in question.

The judgment is reversed and the cause remanded with directions to enter judgment for the appellant.